UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DOMINIC GIBBS,

                    Petitioner,                  **No. 03-CV-0361(RJA)(VEB)**

    -vs-                                  **REPORT AND RECOMMENDATION**

EDWARD DONNELLY, Superintendent,

                    Respondent.

## I.      Introduction

*Pro se* petitioner Dominic Gibbs ("Gibbs" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction one count of second degree (intentional) murder (N.Y. Penal Law §§ 20.00, 125.25(1)). Gibbs was jointly indicted with Pete Nicholas ("Nicholas" or "co-defendant"), but the two men were tried separately.

Gibbs now asserts that he is entitled to habeas relief based upon claims stemming from (1) trial counsel's alleged ineffectiveness, (2) misconduct by the prosecutor, (3) error by the trial court in denying a justification (self-defense) jury charge, and (4) legal and factual insufficiency of the verdict. This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) for the issuance of a report and recommendation regarding the disposition of Gibbs' petition. For the reasons that follow, I recommend that the petition be dismissed.

## II.      Factual Background and Procedural History

### A.      The Shooting

Shortly after 2:00 a.m. on July 12, 1996, Mary Ellen Elphick ("Elphick") and her sister were driving to their home in the Town of Clarkson after hanging out with friends at a bar0. in

the Town of Brockport in Monroe County. As they were heading north on Redman Road in Clarkson, the women came upon a car (1987 4-door blue Toyota Camry) that was stopped in the northbound lane of the road with its hazard lights blinking. T.448.[1] As soon as she saw the hazard lights, Elphick flicked the high-beams of their pick-up truck down. Almost immediatley, Elphick recalled, the Toyota took off "very fast and went into the other lane, and then it went slowly, like from one lane to another, and just sped up and went faster and faster between the lanes." T.448, 469. Elphick also observed a foot protruding from an open passenger-side door of the Toyota as it was driving away. T.450, 470. Elphick stated that the car did not get very far before it veered across the road into a ditch. As the Elphicks passed the Toyota, they could not see inside the vehicle due to the cloud of dust or smoke that was rising from the ditch. T.453. Elphick stated that they did not see anyone outside the car. T.472.

Elphick testified that they did not get out of their vehicle but rather proceeded to the nearest house and stopped there to see if they could summon assistance. Elphick indicated that they thought the driver might be drunk. T.470-71. As they parked and exited their vehicle, Elphick stated, they "heard some arguments and yelling and screaming coming from the vehicle and then [they] heard a pop . . . ." T.454. At that point, the Elphicks were let into the house by the resident of the house which they had approached. Elphick indicated that "[t]here was at least two voices," which were male and sounded "very angry." T.455. There was only one "pop" which happened "after the argument." T.456, 474.

Once inside, Elphick called 911; it was 2:18 a.m. at that time. T.456. As they were waiting for the police to arrived, they looked outside and "could see the lights of the car moving

---

[1] Citations to "T.__" refer to the transcript from Gibbs' trial.

and flickering like they were trying to get out." T.457. It appeared to Elphick "as if the car was rocking back and forth . . . ." T.457. According to Elphick, the police arrived about five to seven minutes later. T.460-61.

Responding to the 911 call were deputy sheriffs from the Monroe County Sheriff's Department and troopers from the New York State Police. First on the scene was Deputy Mark Nevelezer ("Dep. Nevelezer"), who arrived at 2:26 a.m. *See* T.480-523 (direct); 524-42 (cross). Dep. Nevelezer observed that all of the Camry's doors were closed except for the front driver's-side door, which was slightly ajar; no one was inside the vehicle. Dep. Nevelezer found that the disabled Toyota Camry's vehicle's registration sticker had been removed from the front windshield and torn into pieces and strewn on the ground next to the driver's side of the Toyota. It appeared that the sticker had been scraped off the windshield of the car. *E.g.*, T.922-24. There was blood on the gearshift between the two front seats, as well as blood on the driver's side door and on the top metal frame area, just above the window. T.926. The police found a bag and a store box in the trunk, both of which had blood on them. T.927. There were no blood stains on the passenger side, either in the front seat or back seat area. T.960. The car had damage to the right front wheel and its rear license plate was missing. Its wheels were embedded in the soil on the west shoulder of the road, and the car was facing northwest.

Proceeding about 20 feet north of the vehicle, Dep. Nevelezer came upon a male in a semi-prone position, at a slight angle to the roadway with his head towards the vehicle. The man was not verbally responsive and exhibited no signs of respiration. Blood was coming out of the man's left ear, and there was blood on his hands, the top of his head, parts of his hand and arm. Dep. Nevelezer observed that part of the left ear was missing. There was a "Fossil" brand men's

watch lying next to the body. T.976.

### C.    Petitioner's Arrest

Troopers Chris Burns ("Trooper Burnes") and Donald Vlack ("Trooper Vlack") conducted a "roving patrol" of the area and, at 5:12 a.m., on Drake Road, they observed two black males walking south on the east shoulder. Drake Road runs parallel to Redmond Road; the men were seen in the vicinity of 2012 Drake Road, about 1.5 to 2.0 miles due east from where the disabled Toyota and the deceased victim were found. A densely wooded area separates Drake Road from Redmond Road.

Burns and Vlack exited their police cruiser without guns drawn. According to their observations, Gibbs and Nicholas were water-soaked from head to toe, and their clothing was disheveled and very dirty, with leaves and burdocks affixed to them. Gibbs and Nicholas were then taken into custody.

When Dep. Nevelezer arrived at about 5:30 a.m., he observed that Gibbs' clothing was "soiled, wet and appeared to have grass clippings . . . [and] leafy materials on his pants." T.510. Each man had burdocks all over their arms and heads. Nicholas had a pair of pants wrapped around his head; the pants had spots of a red fluid on them. *See* T.680-86.[2]

Upon being asked who they were, where they were going, and where they were coming from, Gibbs and Nicholas pointed towards the woods and told the police that they had been at a "crack house" in the vicinity. T.693. However, they could not give an address. (The closest house on Drake Road was 3/4 of a mile away from where they had been stopped.)  Gibbs and Nicholas said that had been riding a motorcycle borrowed from a "crack head", but it had broken

---

[2]    Through blood-typing analysis, the lab was able to eliminate Rowe, the victim, as the donor of the any of the blood staining the tan pants. T.1185. However, Gibbs and Nicholas could not be eliminated as the donors.

down, forcing them to walk back to the city. Gibbs and Nicholas did not know the name of the "crack head." Nor were they able to provide an address for the "crack house."

Trooper Burns then asked the men for identification, whereupon Nicholas began patting his clothing as if he were feeling for his wallet. As Nicholas, for the second time, moved his hands towards the small of his back, the troopers suspected that he might be reaching for a weapon. At that time, they drew their guns and directed both men to kneel down with their hands up. T.697. During a pat-search of Gibbs, Trooper Vlack found a knife in a sheath attached to the front of his pants' waistband. T.699. There was a red substance on the blade,[3] and the troopers noticed that Gibbs had a fresh cut on his right hand. From Nicholas, the troopers recovered a set of car keys which were later determined to belong to the Toyota Camry. Gibbs' wallet contained $420 in twenty-dollar-bills, and a "flashlight card" T.971.

About twenty feet into the wooded area, the police found a leather jacket, and a shopping bag containing an assortment of clothing with the store tags still attached, e.g., a Mickey Mouse shirt and a shoe box with new Adidas sneakers. T.1046. In a second bag, there was more clothing, and a Nike sneaker. T.1047. Also, the police found a New York State license plate, a wash cloth, some speaker wire. These items were located within about ten feet of each other, kind of scattered about. T.1061. *See also* T.1116-17.

Gibbs and Nicholas were placed in separate police cars and transported to the police station in downtown Rochester for questioning. Gibbs was advised of his *Miranda* rights by Trooper Vlack, and he voluntarily waived them.

The interview of Gibbs commenced at 7:00 a..m. with Investigators Patrick Crough and

---

[3]     Through blood typing analysis, the lab was able to eliminate Rowe and Nicholas as the donor of the blood stain on the knife. T.1177-78. Gibbs, however, could not be eliminated as the donor. T.1186.

Thomas Passmore. Investigator Passmore noticed that Gibbs had a small, fresh cut on the knuckles of his right hand, which Gibbs appeared to be trying to conceal this from the investigators. T.821-22.[4] Investigator Passmore testified,

> I asked Mr. Gibbs if he knew why he was [in police custody] and why I wanted to talk to him and he said no. I then advised Mr. Gibbs that a vehicle and a dead body were found in the ditch in the vicinity of where he and Mr. Nicholas were located, and Mr. Gibbs told me that he knew nothing about that. I then asked Mr. Gibbs what he and Mr. Nicholas were doing in the area where they were located and Mr. Gibbs told me that they went to a friend's hose and took their friend's motor bike out for a ride. After riding around for a little while they returned to the friend's house and because they were gone so long their friend got mad at them and wouldn't give them a ride home and so they started walking. I then asked Mr. Gibbs – I told Mr. Gibbs I would like to confirm his story and I asked for his friend's name and Mr. Gibbs told me that he didn't know it. I asked where his friend lived. Again, Mr. Gibbs said he didn't know where it was. Didn't know where he lived. I then asked Mr. Gibbs where he and Mr. Nicholas were walking to and he said that they were going home. I asked where home was and he said he stays all over the place and wouldn't give me a specific address. At that point I then spoke with Mr. Gibbs about walking through a field, due to his clothing condition as I previously described, and Mr. Gibbs told me that I didn't know he was walking through a field and he didn't admit or deny being in a field, but he wouldn't discuss that with me.

T.808-09. Investigator Passmore then confronted Gibbs, telling him, "I know he was involved in what took place on Redman Road relative to the dead body in the vehicle and I believe that he knew exactly what transpired there relative to those to – relative to the vehicle and the dead body being in the embankment." T.809. Again, Gibbs told Investigator Passmore that "[he] didn't know [he] was there." Gibbs "did not admit and he did not deny being there but . . . told me that he would tell me everything I wanted to know, but he would after he had a chance to talk with an attorney and have him present with him." T.809-10. That was the first time Gibbs had mentioned

---

[4] Deputy Mark Weist, the field evidence technician, testified that while he was photographing Gibbs and Nicholas, said that when he attempted to photograph Gibbs' hand, he "kept kind of like keeping it down and out of sight" and he put his thumb over the cut, making it difficult to see. T.954. Deputy Weist had to instruct Gibbs "numerous times, show me your hands." T.954. It seemed to Deputy Weist to be a "decent" cut. T.961.

wanting to talk to an attorney. This was about 7:15 a.m. At that point, Investigator Passmore left Gibbs sitting in the interrogation room.

During a break in Gibbs' interview, Investigator Passmore learned that Gibbs' story was inconsistent in some respects with the version of events being told by Nicholas, who was being interviewed by different investigators.

In the meantime, Investigator Passmore learned from Investigator Crough, who had been interviewing co-defendant Nicholas, that a Barrington Stewart ("Stewart") owned the blue Toyota, and he and Investigator Crough went to meet with him at 11:25 a.m. This line of inquiry led them to a man named Carlton Gordon ("Gordon"). Both Gordon and Stewart voluntarily came in to the police station to be interviewed. T.818. Investigator Passmore showed them the key ring from the Toyota and two photographs of Gibbs. T.819-20.

Stewart testified at trial that he owned a 1987 blue four-door Toyota which he had lent to Gordon, a friend of his. T.861. Stewart stated that other than Gordon, he did not give anyone else permission to use the Toyota. T.863. Stewart denied knowing petitioner or his co-defendant. T.863. Stewart testified that his car had no damage to it when he lent it to Gordon. T.864. Stewart denied keeping any knives or clothing in the car. T.864.

Gordon testified that Stewart was an old friend of his from Jamaica and allowed him to use the blue Toyota "[a]ll the time." T.397. On the night of July 11, 1996, Gordon had the car and the car keys. T.397. He allowed a person named "D", whom he later identified as Gibbs, borrow the car. T.899-900. "D" said he would bring it back, but he did not say when. T.900, 905. Gordon had known "D" for about "five to six months." Gordon only knew petitioner as "D", having run into him in the neighborhood once or twice a week. T.903-04. Gordon admitted that

7

he knew co-defendant Nicholas from the neighborhood, but had never lent him the Toyota. T.905.

**D.      The Medical Evidence**

The Monroe County Medical Examiner, Dr. Nicholas Forbes, testified regarding his autopsy of Rowe. When the body arrived, it was clad in a green T-shirt suffused with blood in the back portion, a blue tank-top shirt, a pair of brown jeans, a pair of training shoes, two pairs of boxer shorts, a pair of blue socks, a brown belt, a "silver collar on the hand" and "one metal watch" on the wrist. T.1008. A pager and an address book had been removed from his pockets previously by other staff in the medical examiner's office. Dr. Forbes found a black and blue mark around the right eye, and several gunshot wounds. First, there was an entrance wound on the back of the left hand with some gunpowder next to it, indicating a "probably close range of fire," "within inches." T.1010, 1013. There was a corresponding exit wound from the palm side of the left hand. T.1010. Second, there was an entrance wound to the left ear behind which was an entry wound penetrating the skull cavity and passing across the brain. The last wound was located at the back of the skull to the left; it was an entry wound to which there was no corresponding exit wound. T.1010-11. The inference drawn by the medical examiner was that one bullet may have passed through the back of the hand, exited from the front of the hand, and entered the head, near the ear. T.1012. With regard to the internal examination, the two bullet wounds to the head had caused "massive damage" to the brain, in particular to the brain stem. T.1017, 1018. One bullet was recovered, lodged just under the scalp, and there was a copper bullet fragment in the right temporal region. T.1020. On thumb-side of the left forearm, beyond the elbow region, there was a rounded abrasion where the skin had been traumatized and there

8

were "scratch marks in the middle of it." It appears to have some sort of pattern, but the cause was undetermined. T.1015. In the posterior shoulder region there was a rather broad, patterned, scrape mark; the cause of this mark likewise remained unknown. T.1016.

E.     The Defense Case

Gibbs testified that Nicholas was "a longtime friend" whom he had meet in Brooklyn, New York. In July of 1996, Nicholas was living at 86 Union Street in Rochester. When asked to describe the kind of activities in which he and Nicholas participated together, Gibbs responded, "We have musical systems together and drug distribution." T.1241. By "drug distribution," Gibbs meant distribution of marijuana, but no other drugs. T.1241. Gibbs knew Rowe, the decedent, through Nicholas. Gibbs testified that he had known Rowe as long as he had known Nicholas, about "six, seven years."[5] Gibbs also met Rowe in Brooklyn. In July 1996, Rowe was staying at an apartment across the street from Gibbs, on Devonshire. Rowe had been there for about a month. T.1242. Gibbs described Rowe as a "business partner"meaning that they "would purchase marijuana together." With regard to Rowe, Gibbs said, "We were close." T.1242.

On the afternoon of July 11th, Nicholas and Gibbs went to the mall; Nicholas was driving his Nissan Maxima 88. T.1243 Gibbs purchased "some clothing, shoes, the two knives, flashlight card, a belt" and that was about it. He and Nicholas were going to New York City later that day and he "wanted to get some things." T.1244. Gibbs identified the Mickey Mouse t-shirt, which

---

[5]     Colleen Steadman ("Steadman"), the decedent's girlfriend and the mother of his daughter, testified that she had been living with Rowe for three years in Brooklyn, New York. T.1191. Steadman testified that she did not know Gibbs, and had never seen him before. She did know Nicholas, whom she called a "friend of Phillip's." T.1182. Rowe and Nicholas had lived together over the years, including the time that Steadman was living with Rowe. Rowe and Nicholas they had known each other since childhood and were "like brothers." T.1193. In Rowe's address book were Nicholas' home number and beeper number; however, there was no listing for Gibbs in Rowe's address book. T.1194.

he had bought for his son, who lived in New York City with his mother. T.1245.

After they left the mall, they drove back to Gibbs' apartment on Devonshire. He believed that he cut his hand while he was handling the large Bowie knife when the car went over a bump or something. T.1246. Nicholas dropped him off in the early evening, and was supposed to return at 8 or 8:30 p.m. to leave for New York City. T.1247.

Nicholas did not return until "[l]ate, late." T.1248. Gibbs met Nicholas outside, where he and Rowe were smoking marijuana and talking in front of the blue Toyota Camry. T.1249-50. Incidentally, Gibbs denied that Gordon (whom he knew as "Swany") had lent him the blue Toyota Camry. T.1250. The first time he had seen that car was when Nicholas came back with it. T.1250.

Gibbs "had an exchange of words with Pete because [he] was kind of upset that [he] had been waiting so long." T.1251. Nicholas "laughed it off" and "[t]old [him] just to get ready." T.1251. Gibbs went up to his apartment, took care of what he needed to do, and when he returned, Nicholas and Rowe were still in the same place. T.1252. Rowe "wanted [them] to drop him over a friend's house." Rowe said "that he wanted to get his swerve on and we're going into the city so if we could drop him off . . . at a young lady's house." T.1252. Gibbs was still intended to go to New York City at that point. T.1252.

Gibbs said that they all got into the car. Gibbs took the driver's seat; the keys were already inside the vehicle. T.1253. Nicholas was in the front passenger seat, and Rowe was in the back, in the middle. T.1253. They stopped at a convenience store on Chili Avenue to buy some "blunts" and some beverages. T.1255. Gibbs explained that they replaced the tobacco in the blunts with marijuana and were all smoking them. T.1256.

Gibbs said that he was not familiar with the area he was being directed to by Rowe. T.1256. At some point, Rowe announced that "he had to take a piss" so Gibbs stopped the car. They were in a wooded area. T.1257. Rowe got out, and Gibbs and Nicholas (who was napping) stayed in the car with the engine running. T.1258. While Rowe was still outside the car, Nicholas woke up and said, "Did we reach [sic] yet?" and Gibbs said no.

Moments later, Rowe opened Nicholas's door (the front passenger's side) and "pointed something shiny into the car." T.1258. Nicholas "yelled, 'He got a gun.'" T.1258. Gibbs "froze for a while." T.1258. Then, Nicholas and Rowe "started struggling." Rowe was "leaning over into the car and [Nicholas] [was] in a standing position like he's trying to bring one of his legs out of the car." T.1259. That is when Gibbs noticed lights coming from behind; he glanced over at Rowe and saw Rowe look back toward the light. At that moment, Gibbs "pressed on the gas." T.1259. Gibbs had not seen a gun at that point. Up until this moment, there had not been any arguments between or among any of them, nor any threats. As the Toyota moved away, Rowe jumped into the car, and "was like hunched on top of [Nicholas]" in the passenger seat. They "were still struggling." T.1260. Gibbs "didn't see the gun yet" but "[t]hey were arguing." T.1260. Gibbs testified that they were all "excited" and when Rowe reached for him, he (Gibbs) bit Rowe on the arm. T.1261. Gibbs testified that the smaller knife stayed sheathed at his waist, and the Bowie knife was still between the door and the driver's seat.

When Gibbs bit Rowe, that caused him to take his eyes off the road too long; Gibbs "was already driving kind of crazy back and forth." T.1261. That is when he "fully lost control of the car and the car went off, into the ditch." T.1261. "Somehow Pete and Phillip got thrown from the car," probably out of the front passenger's side door, which was open. Then, Gibbs, still in the

driver's seat, "heard the arguing" between Rowe and Nicholas in Jamaican *patois*. T.1262-63. Gibbs "couldn't hear the words exactly but [he] heard the different voices" which were "[l]oud" and sounded like a "[c]ross between angry and scared." T.1263. Gibbs could not see Rowe and Nicholas. The argument did not go on for very along; during it Gibbs "heard the pop." T.1264. Gibbs tried to open the car door but it was blocked by the dirt on the embankment, so Gibbs went through the open passenger's side door and saw Nicholas "like sitting on his butt, leaning back on his elbows." T.1266. When asked if he was okay, Nicholas said he did not know. T.1266. As Gibbs helped him up, he stepped on what he saw to be Rowe's body. T.1266. Gibbs knelt down beside Rowe and shook him and felt something sticky on his hand. He said to Nicholas, "Pete, I think he's dead." T.1268. Gibbs could not remember what Nicholas replied.

Gibbs recalled that he "started panicking" and ran around to the driver's side door, pulled it open, got in, and tried to put the car into reverse. However, the car "wouldn't come out of the mud." Gibbs then got out of the car, "opened up the trunk . . . grabbed his possessions and . . . ran into the woods" to "put as much distance between [him]self, the car, Pete and the body as possible." T.1272. Gibbs did not remember where Nicholas was at that time. T.1272. Gibbs left the keys in the ignition and the headlights on. T.1273. He did not, however, remove the registration sticker or the license plate. T.1273.

Gibbs identified the watchband found on the ground near Rowe's body as his watch. This watch found next to Rowe's body had a broken band. Petitioner claimed that the watchband was not the original band but that at one time, Nicholas accidentally broke the band replaced it. T.1274. Petitioner did not recall whether he was wearing the watch that night, and suggested that Nicholas "might" have been wearing it on the night of the shooting. He acknowledged, however,

that Nicholas was wearing a watch of his own when he was arrested.

Eventually, Nicholas caught up with Gibbs in the woods. Gibbs was going through some bushes and could not get through and had to backtrack; Nicholas had found a better way, and so Gibbs followed him. T.1276. From that point on, they remained together. T.1276. Gibbs did not observe Nicholas with a gun.

Not long after they had run into the woods, they saw the police lights flashing. Gibbs told Nicholas, "we're going to get apprehended and because we left the scene it's going to look real bad." T.1277. Gibbs was telling Nicholas "we should go back." T.1277. Nicholas said "no" because "with his record they won't believe him." T.1278. Gibbs tried to convince him otherwise and then suggested that he (Gibbs) take responsibility. Nicholas said "they still won't believe that neither [sic]." T.1278.

Gibbs walked for what "seemed like forever" heading away from the police lights. Eventually they came to a roadway and proceeded along the shoulder. Later that morning, Gibbs heard a car pulling up some distance away so he turned around and saw it was a police cruiser. Nicholas' "first instinct was to run" so Gibbs said, "if you run you're running by yourself because I said I'm not running no [sic] more." T.1280-81. Nicholas decided to stay with him, and they "just kept on walking." T.1281.

Eventually the police car pulled up closer behind them and signaled them to stop. The officers asked him and Nicholas where they were coming from. Gibbs said they "were coming from a friend's house." T.1281. When asked where they were going, Gibbs said they were "trying to make it back to the city." T.1282. Gibbs said that before he could tell them that he did not have any identification on them, the two officers pulled out their guns. T.1283.Gibbs

admitted that his original story about the motorbike was false, explaining that he lied because he was "[s]cared, stupid." T.1284. The officers took his billfold and the small knife; he had close to $500, which he had obtained from marijuana sales. T.1285.

Once he was at the police station and placed into an interview room, he was handcuffed to the wall. Investigator Passmore came in but did not indicate to him again that he had the right to remain silent, and did not discuss the *Miranda* warnings that he previously had been given. T.1287. Gibbs stated that Passmore "more or less" told him what he had been doing, that he was involved in an incident on Redman Road. T.1288. Gibbs responded, "you don't know that I was and don't know that I wasn't." T.1288. Passmore then told him that he knew Gibbs was walking through a field; Gibbs made a similar reply. At that point, Gibbs said he would like to speak to an attorney. He was not provided with one; nor was he giving a telephone book or a telephone. T.1289.

Gibbs denied killing Rowe and denied planning with Nicholas to kill Rowe. Furthermore, he stated, he did not ask Nicholas to shoot Rowe or assist him in any way. Finally, he denied intending that Rowe be killed. T.1289.

### F. Summary of the Prosecution's Circumstantial Evidence of Intent

The proof of Gibbs' criminal intent was entirely circumstantial.[6] *See* People's Appellate Brief at 26, Respondent's Exhibit ("Resp't Ex.") F at 139. The prosecution, at trial and on direct appeal, argued that the following evidence showed that Gibbs intentionally aided or abetted

---

[6] In upholding the conviction on direct appeal, the Appellate Division concluded that there was a "valid line of reasoning and permissible inferences to lead the jury to the conclusion that defendant shared a community of purpose with codefendant to kill the victim[,]" *People v. Gibbs*, 286 A.D.2d 865, *866, 731 N.Y.S.2d 102, 103 (App. Div. 4th Dept. 2001) (citations omitted), *leave denied*, 97 N.Y.2d 704 (N.Y. 2002), and held that the verdict was both supported by legally sufficient evidence and not against the weight of the credible evidence, *id.*

Nicholas in furtherance of the intentional killing of Rowe.[7]  Gibbs, along with Nicholas, drove

Rowe to a fairly isolated, rural area, about thirty miles in the opposite direction of their stated

destination (New York City). He stopped the car when no other cars were around but, as soon as

another vehicles's headlights appeared, Gibbs stepped on the gas pedal, causing the car to speed

off.

A struggle ensued inside the car, mainly between co-defendant Nicholas and Rowe, the

decedent. One of the decedent's legs was seen hanging out of a door on the passenger's side of

the car while the car was moving. Eventually, the car began swerving erratically and veered off

the road into a ditch.

Although Gibbs maintained that he remained in the car while Nicholas and Rowe argued

on the side of the road after they were thrown from the vehicle, Gibbs' wristwatch, with a broken

band, was found on the ground next to Rowe's body.  Gibbs suggested that co-defendant

Nicholas "might" have been wearing Gibbs' watch that night; however, Nicholas was wearing

another watch at the time he was arrested.

Rowe was shot at least twice soon after the car landed in the ditch. The fatal shot to

Rowe's skull was fired at a close range; according to the medical examiner, it was within inches.

Rowe also sustained a gunshot wound to his hand which, according to the medical examiner,

could have been caused by Rowe putting up his hand in a defensive posture against a shot aimed

---

[7]       Under New York law, to hold a defendant criminally liable as an accessory for acts committed by
a principal actor, the People must prove beyond a reasonable doubt that the accessory possessed the mental
culpability necessary to commit the crime charged and in furtherance thereof, solicited, requested, commanded,
importuned, or intentionally aided the principal. N.Y. PENAL LAW § 20.00; *see also, e.g., People v. Allah*, 71 N.Y.2d
830, 832 (N.Y.1988); *People v. LaBelle*, 18 N.Y.2d 405, 412 (N.Y. 1966). Proof of accessorial intent may be
established from the act itself or from the defendant's conduct and the surrounding circumstances. *E.g., People v.
Cabey*, 85 N.Y.2d 417, 422 (N.Y. 1995); *People v. Bracey*, 41 N.Y.2d 296, 301 (N.Y. 1977).

towards his head.

After seeing that Rowe had been shot and believing him to be dead, petitioner got back into the car and tried to drive the car out of the ditch. When he could not move the car, petitioner removed clothing that he had bought earlier in the day from the trunk and ran into the woods. The registration sticker was torn off the car's windshield, and the license plate had been removed; both of these items were later found in the woods. According to Gibbs, Nicholas caught up with him later, in the woods.

In addition to Gibbs' flight from the scene, the prosecution pointed to Gibbs' admitted lies to the police about his involvement in or knowledge about the incident. When he was stopped two hours later while walking with co-defendant Nicholas along a road parallel to the road on which the shooting occurred, Gibbs stated that he knew nothing about the car in the ditch or Rowe's body. Gibbs maintained his ignorance when he was questioned later at the police station.

Gibbs possessed two knives while he was inside the car. His blood was found on the gear shift of the car and on the blade of the knife that he had in his waistband. When he was stopped later that morning by the police, Gibbs had a cut on his hand that appeared to be fresh, and he also appeared to be attempting to hide the wound from the police.

G.     The Verdict and Sentence

As discussed further below, the trial court denied the defense request to charge the jury on justification (self-defense) under New York Penal Law § 35.15. The jury returned a verdict

convicting Gibbs as an accomplice of second degree (intentional) murder.[8]   He was sentenced to the statutory maximum term of 25 years to life in prison.

### H.     Post-Conviction Proceedings

Gibbs was represented by new counsel on direct appeal. He also submitted a *pro se* supplemental appellate brief. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction, and the New York Court of Appeals denied leave to appeal.

This federal habeas petition followed. For the reasons discussed below, I recommend that a writ of habeas corpus be denied and that the petition be dismissed.

## III.     Analysis of the Petition

### A.     Ground One: Prosecutorial Misconduct

"The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *accord*, *e.g.*, *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994). Gibbs contends here, as his appellate counsel did on direct appeal, that the prosecutor committed misconduct by (1) commenting that petitioner lied to the police, even though there was

---

[8]          Nicholas was tried separately as an accomplice and as a principal; he was convicted under N.Y. Penal Law §§ 20.00 and 125.25(1).  On direct appeal, the Appellate Division that the verdict was not against the weight of the evidence. *People v. Nicholas*, 286 A.D.2d 861, 861, 731 N.Y.S.2d 99, 100 (App. Div. 4th Dept. 2001), *aff'd*, 98 N.Y.2d 749 (N.Y. 2002). The claim of legally insufficient evidence was held unpreserved but, in any event, without merit, since there was a "valid line of reasoning and permissible inferences [that] could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People." *Id.*  However, the Appellate Division reversed Nicholas' conviction and ordered a new trial on the basis that the trial judge erred in denying his challenges for cause with respect to three prospective jurors. *Id.* at 861-82. This Court, in its research, was unable to find any other reported decisions regarding Nicholas and this incident.

testimony by Investigator Passmore that he invoked his right to silence; (2) eliciting testimony

that he requested counsel during his interview with Investigator Passmore;[9] and (3) cross-

examining petitioner about his prior bad acts (i.e., his involvement in a drug-distribution

operation) and referring to those bad acts during his summation. On direct appeal, the Appellate

Division rejected Gibbs' arguments concerning the prosecutor's allegedly improper conduct as

follows:

> Defendant failed to preserve for our review his contentions that the prosecutor
> erred in eliciting testimony that defendant invoked his right to remain silent and
> his right to counsel, and erred in questioning defendant concerning prior acts (*see*,
> CPL 470.05(2)).[10] In any event, reversal based on those alleged errors is not

---

[9]      During the prosecutor's direct examination of Investigator Passmore, who interrogated Gibbs, the prosecutor elicited testimony the following colloquy occurred:

| | |
|---|---|
| A: | At that time I then spoke with Mr. Gibbs about walking through a field, due to his clothing condition as a I previously described, and Mr. Gibbs told me that I didn't know he was walking through a field and didn't admit or deny being in a field, but he wouldn't discuss that with me. |
| Q: | Did you say anything else at that point? |
| A: | Yes. |
| Q: | What was that? |
| A: |  I then told Mr. Gibbs that I know he was involved in what took place on Redman Road relative to the dead body in the vehicle and I believe that he knew exactly what transpired there relative to those two – relative to the vehicle and the dead body being in the embankment. |
| Q: | Did he respond to that statement? |
| A: | Yes. |
| Q: | What did he say? |
| A: | Again, Mr. Gibbs told me that I didn't know he was there. He did not admit and he did not deny being there but he, *at that point in time, Mr. Gibbs told me that he would tell me everything I wanted to know, but he would after he had a chance to talk to an attorney and have him present with him*. |
| Q: | Is that the first time that he mentioned wanting to talk to an attorney? |
| A: | Yes. |

T.809-10 (emphasis supplied). This Court notes, however, that defense counsel first elicited this information on direct examination, in an attempted to show that the police did not timely honor Gibbs' request to speak a lawyer. T.1288-89.

[10]      New York Criminal Procedure Law ("C.P.L.") § 470.05(2), known as "the contemporaneous objection rule," requires that an objection to an error be made "at the time of such ruling or instruction or at any subsequent time when the court ha[s] an opportunity of effectively changing the same." N.Y. Crim. Proc. L. § 470.05(2). Thus, in order to preserve a claim of prosecutorial misconduct during summation for appellate review, a defendant must object to the remarks during trial, and, following the objection, request further instructions or move

required. By refusing to respond to certain questions but while [sic] continuing to respond to others, defendant failed to invoke his right to remain silent; thus, the prosecutor did not err in eliciting testimony on that issue. Although the prosecutor erred in eliciting testimony that defendant requested counsel and thereafter refused to speak with the police, the error is harmless. The evidence of guilt is overwhelming, and there is no reasonable possibility that the error contributed to defendant's conviction. With respect to the prosecutor's questioning concerning defendant's prior bad acts, defendant's direct testimony opened the door to that questioning.

*People v. Gibbs*, 286 A.D.2d at 866 (internal citations omitted).

Respondent argues that the prosecutorial misconduct claims are procedurally barred under the adequate and independent state ground doctrine. *See*, *e.g.*, *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 1044 n. 10 (1989); *accord Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). As the Second Circuit explained in *Velasquez*,

Under *Harris* [*v. Reed*], federal habeas review is precluded "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision." [*Harris*, *supra*.] The rule that 'an adequate and independent finding of procedural default will bar federal habeas review of the federal claim,' *id*. 109 S.Ct. at 1043, applies, absent a showing of cause for the default and resulting prejudice, *see Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977), or a demonstration that failure to consider the federal claim will result in a "'fundamental miscarriage of justice.'" *Murray v. Carrier*, 477 U.S. 478, 495, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982)).

*Velasquez*, 898 F.2d at 9. The Second Circuit has held that the failure to timely object to alleged instances of prosecutorial misconduct constitutes an adequate and independent basis for barring habeas review. *See id.* ("[W]e are barred from reaching the merits of [petitioner's] first three federal claims [including improper prosecutorial summation because the] . . . state court has

---

for a mistrial after the court issues a curative instruction. E.g., People v. Heide, 84 N.Y.2d 943, 944, 620 N.Y.S.2d 814, 644 N.E.2d 1370 (1994) (claim unpreserved where defense counsel failed to object further or request a mistrial after court issued curative instructions).

expressly relied on a procedural default [i.e., the failure to object] as an independent and adequate state ground").

"Federal courts may address the merits of a claim that was procedurally defaulted in state court only upon a showing of cause for the default and prejudice to the petitioner." *Bossett v. Walker*, 41 F.3d at 829 (citing *Wainwright v. Sykes*, 433 U.S. at 87). " "Cause may be demonstrated with 'a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that "some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted in original; alteration and ellipses in original)). In order for attorney error to constitute "cause" excusing the procedural default, counsel's performance must be so egregious as to fail to satisfy the defendant's Sixth Amendment right to effective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. at 488-89.[11] Gibbs' appellate counsel did assert on direct appeal that trial counsel's performance had been constitutionally ineffective on several bases. However, the Appellate Division rejected this contention, holding that the errors were part of the chosen trial strategy, and that viewing the evidence in its totality and as of the time of counsel's performance, Gibbs received "meaningful representation." Unless Gibbs has a meritorious claim of ineffective assistance of trial counsel, he cannot use trial counsel's errors as "cause" to excuse the procedural default. Gibbs' failure to demonstrate cause

---

[11]    The exhaustion doctrine "requires that a claim of ineffective assistance be presented to state courts as an independent claim before it may be used to establish cause for a procedural default" in the context of a petition for a federal writ of habeas corpus. *Id.* (citing *Murray*, 477 U.S. at 489). Thus, to claim that attorney error excuses a procedural default, a habeas petitioner must either have properly presented and exhausted an ineffective assistance of counsel claim in the state courts or, if the ineffective assistance of counsel claim is itself procedurally barred, separately show that there is "cause" excusing said procedural default as well as prejudice resulting from the error. *See* 529 U.S. at 453.

obviates the need for the Court to undertake an analysis of whether any purported cause proved prejudicial." *Jamison v. Smith*, No. 94 CV 3747 (FB),1995 WL 468279, *3 (E.D.N.Y. July 26, 1995) (citing *Roberts v. Scully*, 875 F. Supp. 182, 193 (S.D.N.Y. 1995) ("That being the case [where petitioner failed to establish cause for the default], these claims are barred even without our consideration of whether petitioner can demonstrate prejudice"); *Strickland v. Washington*, 466 U.S. 668, 697 (1984) (noting that district courts can consider the two prongs of an ineffectiveness of counsel claim in either order and the failure of petitioner to satisfy one prong obviates the need to consider the other)).

Additionally, Gibbs fails to allege, much less demonstrate, that this Court's refusal to consider this claim on its merits "would result in a fundamental miscarriage of justice." Murray, 477 U.S. at 486. The fundamental miscarriage of justice exception is reserved only for those cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). Thus, a petitioner can establish this exception only by demonstrating with "'clear and convincing evidence that but for constitutional error, no reasonable juror would have found petitioner [guilty].'" *Washington v. James*, 996 F.2d 1442, 1447 (2d Cir. 1993) (quoting *Sawyer v. Whitley*, 112 S. Ct. 2514, 2517 (1992), cert. denied, 114 S. Ct. 895 (1994)). Because Gibbs has failed to make such a demonstration, he cannot assert that a fundamental miscarriage of justice will occur. Therefore, the Court recommends dismissing Gibbs' claims of prosecutorial misconduct as procedurally defaulted.

### B.     Ground Two: Ineffective Assistance of Trial Counsel

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel.

That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). *Strickland v. Washington* sets forth the familiar two-part standard for adjudicating ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. The Supreme Court has instructed that judicial scrutiny "must be highly deferential" in assessing the reasonableness of counsel's performance. *Id.* at 689. The reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation marks omitted); *accord Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir.1998). Bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). The Supreme Court observed in *Strickland* that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . , and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689; *accord United States v. Jones*, 918 F.2d

9, 11 (2d Cir.1990).

Gibbs' appellate counsel argued on direct appeal in state court that trial counsel's decision to call petitioner as a witness was an unreasonable strategy. He also argued that trial counsel unjustifiably failed to object to the prosecutor's cross-examination of petitioner; failed to object to the prosecutor's summation; and failed to request jury instructions on lesser included offenses. The Appellate Division rejected these claims as follows:

> Defendant was not denied effective assistance of counsel. Most of the alleged instances of ineffective assistance were a part of the defense strategy, and "[a] contention of ineffective assistance requires proof of less than meaningful representation, rather than simple disagreement with strategies and tactics" (*People v. Rivera*, 71 N.Y.2d 705, 708-709, 530 N.Y.S.2d 52, 525 N.E.2d 698; *see*, *People v. Lane*, 60 N.Y.2d 748, 750, 469 N.Y.S.2d 663, 457 N.E.2d 769). Viewing the evidence in totality and as of the time of representation, we conclude that defendant received meaningful representation (*see*, *People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400).

*People v. Gibbs*, 286 A.D.2d 865, 867, 731 N.Y.S.2d 102, 104 (App. Div. 4th Dept. 2001). Where, as here, the state court has rejected the ineffective-assistance claim on the merits, habeas relief may only be granted if the decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Gentry*, 540 U.S. at 5 (quoting 28 U.S.C. § 2254(d)(1)). Gibbs must show that the state court's application of the governing Federal law, was not only erroneous, but objectively unreasonable. *Id.* (citing *Wiggins*, 539 U.S. at 520-521; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (*per curiam*)); *accord Knowles v. Mizrayance*, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Thus, Gibbs must demonstrate both (1) that his attorney's performance "fell below an objective standard of reasonableness," *id.* at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different," *id.* at 694.

   As the Appellate Division observed, an "attorney's  strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 958 (1987). Trial counsel "has wide latitude in deciding how best to represent a client. . . ." *Gentry*, 124 S.Ct. at 4. A reviewing court must not fail to give a sufficient level of deference to counsel's judgments given the evidence arrayed against the defendant and the type of defense the client wishes to pursue.  *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005) ("In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made and by giving a heavy measure of deference to counsel's judgments." (internal quotation marks and citation omitted)). Of particular relevance here is the principle that "'[a]n accused's right to testify is a constitutional right of fundamental dimension.'" *Pinholster v. Ayers*, 525 F.3d 742, 760 (2d Cir. 2008) (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.1993)). "When reviewing ineffective assistance of counsel claims that question the attorney's trial strategy, it is important to "note that a defendant's Sixth Amendment rights are his alone, and that trial counsel, while held to a standard of 'reasonable effectiveness,' is still only an assistant to the defendant and not the master of the defense." *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir.1985) ("Because we recognize that a defendant must have this broad power to dictate the manner in which he is tried, it follows that, in evaluating strategic choices of trial counsel, we

must give great deference to choices which are made under the explicit direction of the client.") (citing *Faretta v. California*, 422 U.S. 806, 820 (1975)) (quoted in *Pinholster*, 525 F.3d at 760) (declining to conclude that trial counsel's decision to advise petitioner to testify in his own defense amounted to ineffective assistance, noting that the record "amply demonstrate[d] that this strategic tactical decision [to have petitioner testify] was deliberate and considered," and that petitioner "actively participated in all key decisions . . . and strongly directed the strategy he wished counsel to pursue."). Here, Gibbs clearly informed the trial court that he wished to take the stand and testify in his own behalf. There is no indication that Gibbs did not expressly concur in the strategy pursued by his trial counsel. T.1236-37.

In the present case,  it was evident throughout trial counsel's direct examination of Gibbs that he was pursuing a cogent and well-planned defense. Appellate counsel argued on direct appeal that the strategy pursued, which allowed petitioner to take the stand was too dangerous, because it entailed him admitting to "prior bad acts" that would not have otherwise been admissible. Specifically, on direct examination, Gibbs admitting to operating a large-scale marijuana distribution enterprise. This testimony was elicited when trial counsel asked Gibbs what kinds of activities he engaged in with co-defendant Nicholas.T.1241. Gibbs answered, "music systems and drug distribution." Gibbs also testified that the decedent, Rowe, was a "business partner" and that they would purchase drugs together. T.1242. Gibbs testified on cross-examination that he had been involved in the operation for several years; it "was quite big" and the "[m]onthly net gross [sic], [was] anywhere from 50 to 60 thousand," on average. T.1350-51. Appellate counsel argued that by allowing Gibbs to testify to being involved with the decedent as "business partners" in a drug-selling operation, trial counsel thus supplied the prosecutor with

a motive for Gibbs to commit murder.

Trial counsel's main argument was that proof of intent in furtherance of murder was "completely lacking," T.1376; *see also* T.1380-81. Trial counsel conceded that the prosecutor proved "many things beyond a reasonable doubt" (e.g., that there was "a lot of brush between Redman Road and Drake Road," that a lot of police officers came out to the scene and saw the car and the body in the ditch, that when Gibbs "was questioned by the police he was untruthful." T.1381-82. However, as trial counsel pointed out, the jury was "told . . . all that in opening statement and . . . more." T.1382. As trial counsel argued, petitioner's "[m]ere presence" at the crime scene was "not enough". T.1382. The prosecutor's case, urged trial counsel, required the jury "to speculate about [petitioner's] intent because there is proof of it," T.1382-83, namely there was no proof that Gibbs did anything in furtherance of the shooting. Trial counsel utilized the tactic of not assigning any importance to the illicit nature of the activities in which petitioner, co-defendant, and the decedent participated; he treated their drug-dealing as "just a job." T.1384.

The Second Circuit has stated that "in case after case," it has "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Loliscio v. Goord*, 263 F.3d 178, 195 (2d Cir. 2001) (citing *Tippins v. Walker*, 77 F.3d 682, 687 (2d Cir.1996) (citing *United States v. Tarricone*, 21 F.3d 474, 476 (2d Cir.1993) (decision to forgo testimony of handwriting expert); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) (decision to forgo opening statement), *cert. denied*, 484 U.S. 957 (1987); *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir.1986) (questioning by defense counsel "opened the door" to damaging evidence), *cert. denied*, 480 U.S. 908 (1987)). To find that defense counsel's chosen strategy was such a professionally deficient judgment as to deny

petitioner of the right to counsel would require this Court to engage in the kind of second-guessing expressly prohibited by the Supreme Court and Second Circuit. Because Gibbs has not demonstrated that defense counsel's representation was objectively unreasonably under prevailing professional norms of practice, he cannot fulfill the "performance" prong of *Strickland*. Accordingly, habeas relief should not issue on this claim.

> **2.    Trial counsel's failure to object to the prosecutor's cross-examination of petitioner.**

As courts have often observed "[w]hen a defendant testifies and offers an alternative account of events, his truthfulness becomes an issue central to the trial's resolution." *Jones v. Poole*, No. 1:07-cv-951-ENV, 2007 WL 2667456, at \*6 (E.D.N.Y. Sept. 6, 2007). Recognizing that "[s]tatements designed to appeal to the jury's emotions or to inflame the passions or prejudices of the jury are improper," *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (internal quotation omitted), the Second Circuit nevertheless has held that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory[,]"*id.* (citing *United States v. Williams*, 529 F. Supp. 1085, 1106-07 (E.D.N.Y.1981), *aff'd*, 705 F.2d 603, 624 (2d Cir.), *cert. denied*, 464 U.S. 1007 (1983)).

The prosecutor's first question on cross-examination was, "Mr. Gibbs, do you admit that you lied to the police on July 12th of 1996?" T.1290. From that point on, the prosecutor repeatedly forced Gibbs to state that he had "lied repeatedly, but not only once, . . . ." T.1290. Gibbs admitted that he lied to the police officers when he was stopped on Drake Road, but he denied lying to Investigator Passmore, T.1291, stating that he did not remember Passmore questioning him about where he and Nicholas were headed. T.1292. The prosecutor got Gibbs to

27

admit that while Passmore was accusing him, he knew that he had been at the crime scene and that one of his close friends was dead and another was involved. T.1293. Gibbs told Passmore that he (Passmore) "didn't know it," and "[i]t was honest to say that he didn't really know." T.1292.

The prosecutor forced Gibbs to admit that he "lied when [he] [was] in a tight spot" when the police officers had stopped him and Nicholas. T.1294; *see also* T.1303.[12] Gibbs conceded that being on trial for murder also put in him a "tight spot . . . ." T.1295. The prosecutor questioned Gibbs so as to compel him to admit that he "chose to conceal and hide what [he] knew to have happened by telling this farfetched story" and "continued to conceal what [he] knew" and "lied in that tight spot on July 12th of 1996 . . . ." T.1295. Again, the prosecutor forced Gibbs to agree that he "consciously lied to the Troopers" and it "was a deliberate plan . . . to confuse or to conceal or to not tell the police what really happened . . . ." T.1296. This type of questioning occupied the greater part of the prosecutor's cross-examination. *See also* T.1294 (Q: "You do admit that you lied, correct?" A: "Yes, sir."); T.1299 ("having lied to the State Troopers who really didn't accuse you of anything . . . ."); T.1301-02 ("And even though [the troopers] didn't accuse you of anything, you consciously, deliberately lied to them, right?"); T.1302 ("And you held out hope that your lies might pass and that they might let you go on your way, correct?"). *See also* T.1323, 1349, 1357.

Gibbs explained that he at first went along with Nicholas and fled the scene, in the hopes that he would eventually persuade Nicholas to go back and take responsibility. T.1277. According to Gibbs, Nicholas refused because he had a prior criminal history and stated that the

---

[12] This drew defense counsel's only objection, which was overruled by the trial judge. T.1302-03.

police would not believe him. After failing to convince Nicholas otherwise, Gibbs testified that he told Nicholas that he (Gibbs) take responsibility, a plan to which Nicholas did not agree. Finally, Gibbs testified, it was when they saw the lights of the police cruiser that he told Nicholas that he (Gibbs) was not going to run anymore. When he was first questioned, Gibbs testified that he knew the police would not believe him, no matter what he said. Gibbs explained, "Me and Pete [sic] walking on the street. This incident took place. And we're in a predominantly white neighborhood. We're on the streets early, early morning. It's just bad from the beginning." T.1297. Gibbs conceded that he did not know the street or town, but he "knew it was country" and therefore he was "in trouble." T.1298.

Under other circumstances, this Court would agree that the prosecutor's questions and remarks about Gibbs having lied when he was first stopped by the police were excessive and improper. Here, however, the clear articulated defense strategy was to have Gibbs take the stand, and testify to a version of events that admittedly was different from what he initially told the police. A necessary part of this strategy involved Gibbs admitting to being untruthful at first. Defense counsel, in his opening statements, attempted to preempt the prosecutor's likely accusations that Gibbs was "a liar" by telling the jury up front that they were going to hear that Gibbs had not been truthful in his first dealings with the police, and that they were going to hear the reasons for his lack of candor. Then, in his adeptly presented closing argument, defense counsel questioned why the prosecutor was spending so much effort on establishing that Gibbs had lied at one time, as it was something that the defense had conceded from the beginning. With that in mind, trial counsel reasonably could have concluded that letting the remarks and questions pass by rather than calling attention to them by an objection, which in all likelihood

would have been overruled, was the best way to blunt the effect of the prosecutor's histrionics. Under the particular circumstances of this case, given defense counsel's deliberate trial strategy, I cannot find that Gibbs was prejudiced by trial counsel's failure to object to the prosecutor's characterization of him as a "liar" as there is no reasonable probability that the outcome of the trial would have been different had counsel objected. Accordingly, I recommend that this ground for relief be dismissed.

3. **Trial counsel's failure to object to the prosecutor's remarks in summation referring to his status as a drug dealer and the fact that he lied.**

Gibbs contends that it was professionally unreasonable for trial counsel not to object to the prosecutor's references, during summation, to Gibbs' drug-dealing enterprise and to the fact that Gibbs lied to the police. As the Appellate Division found, both of these tactical decisions flowed from trial counsel's well-planned, cogently presented defense theory. The Second Circuit has cautioned numerous times that the mere lack of success of a chosen strategy does not warrant judicial second-guessing. *E.g.*, *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir.1986), *cert. denied*, 480 U.S. 908 (1987); *United States v. Aulet*, 618 F.2d 182, 189 (2d Cir. 1980) ("We are reluctant to second guess matters of trial strategy simply because the chosen strategy has failed.").

With regard to the comments about petitioner's untruthfulness, it was part of defense counsel's strategy to acknowledge that petitioner lied. Trial counsel suggested that given their appearances that night, petitioner and co-defendant had "reason to be apprehensive" about the police's response. Counsel told the jury,

"Mr. Gibbs lied to the police officers. There is no way to sugarcoat it or make it

sound nice. [The prosecutor] spent a lot of time with that on cross-examination yesterday. I suggest to you, you don't need to spend a lot of time with that in deliberations. We admitted it to you on opening statement. There is no question that he lied. The question is, why did he do it? And the question is, because he lied then, is he lying now? Well, he told you why he did it. He had this agreement, originally, with Pete Nicholas in the woods. 'I will take the responsibility for you' but he chickened out and he doesn't do it. He just tells that to Pete Nicholas because he figures he and Pete are tight. Pete won't let him take the responsibility for something he didn't do, and they can go back together and face the music, if you will. But Pete doesn't go for that and when it comes down to it, when push comes to shove, [petitioner] doesn't take the responsibility. He doesn't blow in his friend Pete Nicholas. He tries to fabricate this lie."

T.1398-99. Given the chosen defense strategy, any objection to the prosecutor pointing out that petitioner had lied, in all likelihood, would not have been successful. Thus, this Court cannot say that petitioner was prejudiced by trial counsel's tactical decision not to object, as there is no reasonable probability that the outcome of the trial would have been different.

Similarly, with regard to the drug-dealing operation, trial counsel attempted to use this to the defense advantage. In fact, he argued that this played a part in petitioner's initial decision not to be truthful: Given that petitioner, co-defendant, and the victim "were engaged in the distribution of marijuana to the tune of $50 to $60,000 dollars a month, he testifie[d], in a good month[,] [u]nder those circumstances police officers are probably not looked upon by Mr. Gibbs and Mr. Nicholas as friends or confidants where [sic] someone with whom you can share a secret. So that may have been part of the reason why he was untruthful. But it doesn't have anything to do with guilt or innocence for this offense." T.1400.

Trial counsel sought to use the large scale of Gibbs' drug operation as evidence negating a motive involving drugs. Counsel pointed out that when petitioner and co-defendant were stopped, they had "about $700 dollars or so between the[,]" "[n]ot inconsistent with a trip to New York City" and "[p]eanuts when you're talking about $50 to $60 thousand a month in a

drug distribution operation. So that doesn't really fly." T.1401-02. Apologizing for his imagination not being broader, trial counsel asked rhetorically whether the motive could be a "drug deal going bad" but pointed out that there was "no evidence of any drug deal out here in Clarkson" and "no testimony of any plan or any arrangement with respect to that." T.1402. Counsel argued that while "[t]hese other motives" required "[a] reach . . . so long that it hurts[,]" petitioner's explanation did not require such leaps of logic. T.1402.

Apart from the fact that trial counsel's failure to object to the prosecutor's remarks during summation was not inconsistent with his clearly defined strategy, the comments which mentioned Gibbs' status as a drug dealer were not improper. In particular, the prosecutor did not argue to the jury that the drug-selling activities of the three men provided a motive for murder. Rather, he asserted (as trial counsel preemptively did during his summation) that there was "no motive" and that the death of Philip Rowe resulted from an irrational act. He did ask the jury whether a "major drug distributor" would "not [be] motivated or interested in this case," T.1446, but he was entitled to argue that the jury could take these "prior bad acts into consideration as a factor in determining the credibility of such witnesses' testify [sic]," as the trial court's instruction explained.

### 4. Trial counsel's failure to request jury instructions on lesser included offenses.

Gibbs also contends that trial counsel was ineffective in declining to ask that the trial court charge the jury on lesser included offenses, namely, first degree manslaughter based on an intent to cause serious physical injury, New York Penal Law § 125.20(1), and second degree manslaughter, based on recklessly causing the death of another, New York Penal Law § 125.15(1), as lesser included offenses of murder in the second degree.

32

Under New York state law, in order to be entitled to a charge on a lesser included offense, a defendant must not only show that it is theoretically impossible to commit the greater crime without committing the lesser, he must also establish that there is a reasonable view of the evidence that would permit the jury to conclude that the defendant committed the lesser but not the greater offense. *People v. Green*, 56 N.Y.2d 427, 432 (1982). Under N.Y. Crim. Proc. Law § 300.50, if there is no "reasonable view of the evidence" which would support such a finding, the court may not submit such lesser offense.

Even if it would have been proper as a matter of state law for the trial court to charge the lesser offenses, "the failure of petitioner's counsel to [request it to] do so in this case amounted to a tactical choice not rising to the level of ineffective assistance of counsel[,]" for "[a] failure to request charges on all possible lesser included offenses may be proper trial strategy." *Colon v. Smith*, 723 F. Supp. 1003, 1008 (S.D.N.Y. 1989) (citing *Ford v. Smith*, No. 77 Civ. 1021, slip op. (S.D.N.Y. Oct. 31, 1977); *United States ex rel. Johnson v. Vincent*, 507 F.2d 1309 (2d Cir.1974), *cert. denied*, 420 U.S. 994 (1975)). Allowing the jury to deliberate on lesser included offenses "may give the jury a basis for finding a defendant guilty of a crime where the prosecution was unable to prove the elements of the original crime charged beyond a reasonable doubt." *Colon*, 723 F. Supp. at 1008. This Court cannot say that Gibbs' trial counsel, having vigorously pursued a defense that his client was completely uninvolved in the shooting, was inappropriate in seeking to avoid this possibility. *See id.* A defense which denies guilt is "a strategy that 'practically precludes a request for an instruction on a lesser included offense.'" *Yu v. United States*, No. 97 Civ. 2736, 1997 WL 423070 at *3 (S.D.N.Y. July 29, 1997) (quoting *Rios v. United States*, No. CV-91-4384, 1992 WL 328931, at * 6 (E.D.N.Y. Oct. 13, 1992)). The strategy of pursuing a

33

completely exculpatory defense instead of a partially exculpatory defense is one of the many decisions made by trial counsel which are entitled to substantial deference. *See United States v. Di Tommaso*, 817 F.2d 201, 215 (2d Cir. 1987) (holding that failure of trial counsel to argue for admission of exculpatory portions of defendant's postarrest statement which codefendant had successfully moved to redact was not ineffective assistance, where statement, viewed in its entirety, contained not only denial that defendant counted drug profits, but also admission that defendant, along with codefendant, met third person on two occasions, and statement was properly redacted because of its tendency to inculpate codefendant).Therefore, I do not recommend finding that trial counsel's decision not to request lesser included offenses was objectively unreasonable in light of prevailing professional norms. Accordingly, Ground Two should be dismissed.

C.   **Ground Three: The verdict was not supported by legally sufficient evidence and was against the weight of the credible evidence.**

1.   **The "insufficiency of the evidence" claim is procedurally defaulted.**

Respondent argues that Gibbs' "insufficiency of the evidence" claim is unexhausted because, although appellate counsel raised before the intermediate appellate court, he did not include it in his letter seeking leave to appeal to New York's highest appellate court. Under the habeas corpus statute, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement requires a habeas petitioner to present his federal constitutional claims to the highest court of the state. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir.1991) (citations omitted); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The

mere inclusion of appellate briefs does not fairly present a petitioner's constitutional claims for purposes of the exhaustion requirement. *See Jordan v. Lefevre*, 206 F.3d 196, 198-99 (2d Cir.2000); *see also* N.Y. COURT RULES § 500.10(a) (requiring counsel to "identify the issues on which the application is based"). Here, Gibbs' appellate counsel's leave letter specifically identified only two issues for review by the New York Court of Appeals–the ineffectiveness of trial counsel and petitioner's entitlement to a jury instruction on justification. By addressing in the letter application one particular issue - the reasonableness of showup identifications, the New York Court of Appeals would reasonably conclude that only the two issues discussed in the letter were being raised and not any of the other issues contained in the Appellate Division briefs. *See Grey v. Hoke*, 933 F.2d at 120 (petitioner identified one claim in his leave to appeal letter and also attached his Appellate Division briefs, which raised three issues including the one specified in the letter; circuit held that only the one claim expressly raised in the leave letter had been exhausted).

Gibbs is now barred from making any additional leave application because one has already been denied by the Court of Appeals. *See* N.Y. COURT RULES § 500.10(a) (providing a defendant with only one leave application); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054 (1995). He is also foreclosed from bringing these claims in the state courts as a collateral attack on his conviction because the claims either were raised or could have been raised on his direct appeal. *See* N.Y. CRIM. PROC. L.§ 440.10(2)(a), (c).

As Gibbs no longer has remedies available in state court, his claim must be "deemed" exhausted. Bossett, 41 F.3d at 829. But because the mechanism by which the claim was constructively exhausted also creates a state-court procedural default, habeas review is barred

unless Gibbs can establish cause and prejudice for the default or demonstrate that failing to consider his federal claims will result in a "fundamental miscarriage of justice," see, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989), which requires a showing of "actual innocence."

Gibbs has shown neither cause for his default and prejudice resulting therefrom, nor that dismissal of the petition without addressing the merits of the defaulted claim would amount to a "'fundamental miscarriage of justice.'" *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir.2006), cert. denied sub nom. *Jimenez v. Graham*, __ U.S. __, 127 S.Ct. 976, 166 L.Ed.2d 740 (2007) (quoting O'Sullivan v. Boerckel, 526 U.S. at 854 (1999)). I therefore recommend finding that Gibbs' "insufficiency of the evidence" claim should be dismissed based upon an excused procedural default.

### 2. Petitioner's "weight of the evidence" claim is not cognizable on habeas review.

Gibbs' "weight of the evidence" claim derives from New York Criminal Procedure Law ("C.P.L.") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). Thus, a "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y.1987). Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire*, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated

the Constitution, laws, or treaties of the United States."). Federal courts routinely dismiss claims attacking a verdict as against the weight of the evidence on the basis that they are not federal constitutional issues cognizable in a habeas proceeding. *Ex parte Craig*, 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . . "), *aff'd*, 263 U.S. 255, 44 S.Ct. 103, 68 L.Ed. 293 (1923); *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y.2006) (same); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y.2002) (same); *Correa v. Duncan*, 172 F. Supp.2d 378, 381 (E.D.N.Y.2001) (A "'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles. Accordingly, the Court is precluded from considering the [weight of the evidence] claim.") (citations omitted)). As the Second Circuit has explained, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; stating that it must defer to the jury's assessments of both of these issues." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996). For these reasons, I recommend that the "weight of the evidence" claim be dismissed.

> **D.      Ground Four: The trial court erroneously denied petitioner's request for a jury instruction on self-defense (justification).**

During the charge conference at the conclusion of the proofs, defense counsel argued that Gibbs was entitled to a jury instruction on the defense of justification (self-defense) because, viewing the evidence in the light most favorable to Gibbs, it "does make out a just possibility, at least of a justification defense on behalf of Mr. Nicholas" because if Nicholas' "conduct was justified, then no criminal act was committed, and [Gibbs] could not be convicted of aiding or abetting a lawful act." T.1368. After hearing argument on the issue, the trial court denied the

37

request. On appeal, the Appellate Division held as follows:

> [The trial court] properly denied defendant's request for a justification charge. Although defendant did not act in self-defense, he contends that he was entitled to assert a justification defense vicariously because codefendant [Nicholas] acted in self-defense. Even assuming, *arguendo*, that defendant is entitled to assert that defense vicariously, we conclude that there is no reasonable view of the evidence, viewed in the light most favorable to defendant, that codefendant was justified in using deadly physical force (*see*, [N.Y.] Penal Law § 35.15; *see generally*, *People v. Cox*, 92 N.Y.2d 1002, 1004, 684 N.Y.S.2d 473, 707 N.E.2d 428; *People v. Butts*, 72 N.Y.2d 746, 750, 536 N.Y.S.2d 730, 533 N.E.2d 660).

*People v. Gibbs*, 286 A.D.2d 865, 867, 731 N.Y.S.2d 102, 104 (App. Div. 4th Dept. 2001).

"[A] finding that the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights." *Davis v. Strack* (quoted in *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005)). The "first step requires asking whether, 'on any reasonable view of the evidence, the fact finder might have decided that the defendant's actions were justified' pursuant to New York Penal Law § 35.15." *Id.* (quoting *Davis*, at 124 (quotation omitted).[13] This Court has not found any New York state precedent confirming that the justification defense under Penal Law 35.15 is available "vicariously" to a defendant with regard to a co-defendant's actions; as noted above, the Appellate Division assumed without deciding that this was possible, but that there was no reasonable view of the proof at trial under which petitioner was "justified" in using deadly force, even if "vicariously."

---

[13]    "The leading New York cases construing the justification defense establish a subjective and an objective component: The fact-finder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances. New York law also imposes a duty to retreat in some circumstances: If a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost. N.Y. PENAL LAW § 35.15(2)(a)." *Jackson v. Edwards*, 404 F.3d at 623 (other internal citations omitted).

I note that as a threshold matter, Gibbs' primary defense that there was no proof that he

shared co-defendant Nicholas' intent to kill Rowe did not preclude the assertion of self-defense.

As the Second Circuit has explained,

> [A] defendant does not concede the intent to kill by asserting the defense of self
> defense. *See Ramirez v. Jones*, 683 F.2d 712, 716 (2d Cir.1982), cert. denied, 460
> U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983). Rather, one can act in self
> defense, as in defense of others, consistently with a number of possible intentions.
> "[O]ne can shoot to kill in self-defense, shoot to wound in self-defense, shoot to
> frighten in self-defense, or even shoot reactively in self-defense with no specific
> purpose." *Mason v. Balkcom*, 669 F.2d 222, 227 (5th Cir.1982), *cert. denied*, 460
> U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983); *see also Ramirez*, 683 F.2d at
> 716. Conversely, the presence of a claim of justification does not negate the intent
> to kill, or, for that matter, any other criminal intent. Instead, justification is a
> defense that renders noncriminal an otherwise criminal act, regardless of the
> defendant's intent.

*Harris v. Scully*, 779 F.2d 875, 879-80 (2d Cir. 1985). The New York courts do not view the

statutory defense of justification as negating any of the elements of second degree murder, or any

other crime. *Id.* Penal Law 35.15 instead "reflects a legislative judgment that the circumstances

surrounding an otherwise criminal act warrant an exception to the criminal liability that

ordinarily would attach." *Id.*

Under New York law, a defendant is entitled to a justification charge if the evidence,

considered in a light most favorable to the defendant, reasonably supports the defense. *Id.* at

124-25 (citations omitted). Specifically, New York Penal Law § 35.15(1) provides that "[a]

person may, subject to the provisions of subdivision two, use physical force upon another person

when and to the extent he or she reasonably believes such to be necessary to defend himself ...

from what he ... reasonably believes to be the use or imminent use of unlawful physical force by

such other person." Under New York Penal Law § 35.15(2)(a), however, an individual may

justifiably use deadly force against another person only when the "other person is using or about to use deadly physical force." Thus, "[i]n order to be entitled to a justification instruction, a defendant must show both that he subjectively believed that deadly force was necessary under the circumstances and that a reasonable person in his situation would have held this belief." *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (citing *People v. Goetz*, 68 N.Y.2d 96, 115 (N.Y. 1986). "Even if a defendant reasonably believed that deadly force was necessary, his actions were not justified if he knew that he could, with complete safety, avoid using deadly force by retreating." *Id.* (citing N.Y. PENAL LAW § 35.15(2)(a)).

When evidence relating to the defense of justification is offered by a defendant in New York state, "the court shall rule as a matter of law whether the claimed facts and circumstances would, if established, constitute [the] defense." N.Y. Penal Law § 35 .05. Thus, the trial court must preliminarily rule upon the "admissibility of such evidence and exclude proof that does not or would not constitute a valid defense if the asserted facts are accepted as true." 35 N.Y. Jur. 2d Criminal Law § 3468; *see also People v. Craig*, 78 N.Y.2d 616, 623 (1991) (stating that a court, as a threshold legal question, must decide whether the defense will lie). "In determining whether the evidence in a particular case warrants the giving of a justification charge, New York courts repeatedly have emphasized that the evidence is to be construed in the light most favorable to the defendant." *Blazic*,  900 F.2d at 540 (citing *People v. Steele*, 26 N.Y.2d 526, 529 (N.Y. 1990); *People v. McManus*, 67 N.Y.2d 541, 549 (N.Y. 1986)). If there exists a reasonable view of the evidence from which a jury could conclude that the defendant's acts were justified, the instruction must be given, and  failure to do so may constitute reversible error. *Id.* "It is not for the trial court to hypothesize other reasonable alternatives to the course of action chosen by the

defendant." *People v. Maher*, 79 N.Y.2d 978, 981 (N.Y. 1992) (internal citation omitted). Thus, in determining the threshold question of entitlement to the defense, "if the record includes evidence which, viewed in the light most favorable to the defendant and drawing all reasonably permissible inferences in his favor, satisfies the essential elements of the defense of justification, the charge must be given." *Davis v. Strack*, 270 F.3d at 125. On the other hand, a court need not charge justification if no reasonable view of the evidence establishes the elements of the defense." *People v. Reynoso*, 73 N.Y.2d 816, 818 (1988). Stated another way, "a court is not required to adopt an artificial or irrational view of the evidence in deciding whether a justification charge is warranted." *Blazic*, 900 F.3d at 540 (citing *People v. Butts*, 72 N.Y.2d 746, 750 (N.Y. 1988)).

Notably, as Gibbs points out, the fact that a defendant denies all involvement in the shooting does not preclude the availability of the justification defense. Petitioner's *Pro Se* Supplemental Appellate Brief ("Pet'r *Pro Se* App. Br.") at 3, Resp't Ex. E at 92 (citing *People v. Hill*, 226 A.D.2d 309, 642 N.Y.S.2d 222 (N.Y. App. Div. 1st Dept. 1996). In *People v. Hill*, the defendant denied any intent to kill the victim and "essentially claimed that the killing was an unintentional and accidental by-product of the struggle," and consequently "the trial court declined, over objection, to charge the defense of justification." *Hill*, 642 N.Y.S.2d at 223. The Appellate Division found, however, that "[i]f the jury chose to believe defendant, a reasonable view of the evidence could have established self-defense[,]" and that under the circumstances the refusal to instruct the jury as to justifiable homicide pursuant to N.Y. Penal Law § 35.15(2)(a) reversible error. *Id.* (citing, *inter alia*, *People v. Jeffries*, 166 A.D.2d 665, 561 N.Y.S.2d 86 (N.Y. App. Div. 2d Dept. 1980) (holding that it was reversible error to refuse defendant's request for

justification charge on ground that defendant's version of an accidental shooting was inconsistent with justification defense, where defendant testified that victim was the aggressor who pulled a gun from his waist area, and that, during struggle for the gun, it accidentally fired and killed victim); *see also Davis v. Strack*, 270 F.3d 111, 125 (2d Cir. 2001) (citing, *inter alia*, *People v. Padgett*, 60 N.Y.2d 142,144-45 (N.Y.1983) (even where an aspect of defendant's testimony was inconsistent with justification defense, justification should have been charged); *People v. Watts*, 57 N.Y.2d 299, 301 (N.Y. 1982)).

Because "it is basic that a jury may accept portions of the defense and prosecution evidence or either of them[,]" "inconsistency in claimed defenses or even between a defendant's testimony and a defense should not deprive defendant of the requested charge if the charge would otherwise be warranted by the evidence[,]" *People v. Butts*, 72 N.Y.2d 746, 750 (N.Y. 1988) (quotations and some citations omitted) (citing, *inter alia*, *People v. Steele*, 26 N.Y.2d at 529 (holding that defendant, charged with assault, was entitled to an instruction on defense of a third person, despite his testimony that he was not even at the scene of the crime; on the particular record before the court, the prosecution's witnesses created the opportunity for the defense; "[s]ince a jury might disbelieve the alibi and still find, on the prosecution's evidence, that defendant acted justifiably, the prosecution claim of inconsistent defenses is not a bar to the charge requested)); *People v. Padgett*, 60 N.Y.2d at 144-45 (In prosecution for criminal mischief arising out of barroom incident during which defendant broke glass in an emergency fire exit door, defendant's testimony to effect that he broke glass when he pushed on door frame while attempting to retreat from unprovoked assault by bar owner was sufficient to require requested charge on defense of justification, notwithstanding fact that he never admitted that he intended to

cause property damage); *People v. Perry*, 61 N.Y.2d 849, 850-51 (N.Y. 1984) (holding that defendant was entitled to a charge on intoxication, even though his claim of inebriation, negating the requisite criminal intent, was entirely inconsistent with his testimonial denial of the criminal conduct and his insistence that he was fully aware of his actions).

Respondent also argues that even if the jury were to accept petitioner's testimony that the decedent initially had a gun, the proof showed that only one gun was used in the incident, that co-defendant was in control of it at the time the fatal shot was fired, and therefore co-defendant Nicholas cannot be said to have acted in self-defense. As respondent notes, there were no guns found at the crime scene. The murder weapon was never recovered. Respondent concludes from these facts that the shooting occurred *after* co-defendant obtained control of the gun from the decedent, at which point co-defendant was no longer danger of having deadly physical force used against him, and there was no reasonable need for him to use deadly physical force against the decedent. Although the Court agrees that the evidence supports the inference that only one weapon was available to the parties at the scene, it does not, as respondent argues, necessarily compel the conclusion that decedent was not armed at the time he was shot or that the threat of deadly force against co-defendant had ceased when the fatal shot was fired. *See Blazic v. Henderson*, 900 F.2d at 541("Viewing the evidence in the light most favorable to Blazic, as we must, we cannot agree that the threat of deadly force against Blazic had ceased when the fatal shot was fired. Even if Blazic had pinned Oliveras' right hand behind his back, Blazic did not thereby remove the threat that Oliveras could shoot him. Blazic testified that the fatal shot was fired as he attempted to gain control over the gun, not while he had exclusive possession of it. At bottom, there was evidence indicating that the gun was fired during a struggle for its possession,

and under these close circumstances, according to New York case law, a justification charge was warranted.") (citations omitted). Of course, as respondent points out, there was an absence of direct testimony about the concerning the circumstances that existed just before the shooting. Respondent argues that because petitioner did not see what happened to co-defendant and the decedent after they were thrown from the car, the jury would be forced to resort to "sheer speculation" and therefore it should not even be permitted to consider self-defense.

Viewing the evidence in the light most favorable to the defense, and drawing all inferences in favor of the defense, this Court believes that here was sufficient evidence presented to the jury by petitioner's own testimony to raise the defense of justification. Here, Gibbs testified that there was an unprovoked attack by decedent Rowe (who was outside the car) upon co-defendant Nicholas (who was sitting in the passenger's seat) According to petitioner, the decedent opened Nicholas's door (the front passenger's side) and "pointed something shiny into the car," and he heard co-defendant yell out, "He [sic] got a gun.'" T.1258. Although Gibbs did not testify to actually seeing a gun, it is undisputed that there was a gun involved in the incident, and that Rowe was fatally shot. Co-defendant and the decedent began struggling, with the decedent leaning over into the car and co-defendant in a semi-standing position. At that moment, petitioner noticed headlights behind them and stepped on the gas; however, he still had not seen a gun. As the car moved away, the decedent jumped into the car, hunched on top of co-defendant and struggling and arguing with him. According to petitioner, the decedent grabbed him around his neck at one point, and he (Gibbs) bit the decedent on the arm. At that point, Gibbs lost control of the car and it veered off into the ditch. T.1261. The next thing he knew, co-defendant and the decedent had been ejected from the car. Gibbs remained in the car and heard co-

defendant and the decedent arguing outside. He then heard a "pop," presumably, the gun being fired. Thus, petitioner did not see what happened to co-defendant and the decedent after they were thrown from the car and did not witness the shooting, which occurred soon thereafter outside of the car.

To make justification charge unwarranted, it must be said that have been objectively reasonable for Nicholas to believe that his life was in danger, and that it also would have been the case that Nicholas could have retreated in complete safety. Although there was a gap in the evidentiary narrative, the Court does not believe that, given the minimal standard that a defendant must meet in order to obtain a jury instruction charge on justification under New York law, and the closeness of this case, Gibbs should have been denied his request to charge justification, assuming that he was entitled vicariously assert the defense.

However, "[a] mere error of state law does not deny a defendant his right to due process." *Blazic*, 900 F.2d at 541 (finding that trial court erred in denying habeas petitioner's request for jury instruction on self-defense, proceeding to analyze "whether the omission of a justification instruction violated Blazic's right to due process") (citing *Gryger v. Burke*, 334 U.S. 728, 731 (1948); *Schaefer v. Leone*, 443 F.2d 182, 185 (2d Cir.), *cert. denied*, 404 U.S. 939 (1971); *United States ex rel. Means v. Solem*, 646 F.2d 322, 332 (8th Cir.1980) (failure to give properly requested justification charge does not by itself violate due process, but under circumstances of particular case, refusal instruct the jury on self-defense was an error of "constitutional magnitude"). This entails "ask[ing] whether the failure to give such a charge was sufficiently harmful to make the conviction unfair." *Jackson v. Edwards*, 404 F.3d at 623 (citing *Davis*, at 124 (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). Under the particular facts of

this case, I do not believe that there also has been an error of federal constitutional magnitude because even if the jury had been instructed on justification, there is no significant likelihood that the verdict would have been affected, *Henderson v. Kibbe*, 431 U.S. 145, 155-56 (1977). *Compare Blazic*, 900 F.2d at 534 *with Davis v. Strack*, 270 F.3d at 132 and *Jackson v. Edwards*, 404 F.3d 612, 625 (2d Cir. 2005).

In *Davis v. Strack*, the Second Circuit held that the trial court's failure to give a justification instruction in the petitioner's trial for second degree murder violated due process and entitled the petitioner to habeas relief because the omission was nothing less than "catastrophic," 270 F.3d at 132. The error in *Davis* was, as the Second Circuit reiterated in *Jackson v. Edwards*, of "immense importance" because it was "not a case of a minor error of state law in explaining the legal standards to the jury" or "a case of a refusal to instruct on a fantastic, improbable defense that the jury was unlikely to adopt."404 F.3d at 625 (quoting *Davis*, 270 F.3d at 132). Rather, "the failure to instruct the jury on justification deprived [petitioner] Davis, who had confessed to the shooting, of a 'highly credible defense' to homicide." *Id.* (quoting *Davis*, 270 F.3d at 131.

Similarly, in *Jackson v. Edwards*, the Second Circuit affirmed the grant of habeas relief based upon the failure to give a justification charge where "in the face of [petitioner] Jackson's confession, the jury *could not acquit* without having been instructed on justification." 404 F.3d at 625 (emphasis supplied). In addition, the justification defense claimed by the petitioner "relie[d] not on his own testimony-he did not testify at the trial–but rather on the statements and testimony of numerous witnesses, including state witnesses, as well as on his videotaped confession."  Given the nature of the proof at trial, the Second Circuit found "ample grounds for

a jury to credit Jackson's justification defense, even if it found that the prosecution otherwise met its burden" of showing that Jackson was criminally liable for the offense charged.

In contrast to *Davis* and *Jackson* stands *Blazic*, in which the Second Circuit found that the trial court erroneously failed to give justification charge under a theory of accidental shooting, but ultimately found that the error did not affect the verdict. and disagreed with the district court's conclusion that ere was "no reasonable view of the evidence that, at the time of the shooting, petitioner reasonably believed the victim was using or about to use deadly physical force." Because petitioner Blazic testified that he had subdued the victim; according to the district court, this "undercut Blazic's argument that the shooting occurred in the context of his acting in self defense." The conclusion that Blazic could no longer have been acting in self defense at the time the fatal shot was fired was based on the faulty assumption, however, that the threat of deadly force once petitioner pinned the victim's right hand behind his back and the victim lost control of the gun. The circuit could not agree that the threat of deadly force against Blazic had not ceased when the fatal shot was fired, for there was evidence (in the form of petitioner's testimony) indicating that the gun was fired during a struggle for its possession, not while petitioner was in exclusive possession of it. Although those "close circumstances" warranted a justification charge, based upon the proof at trial, the Second Circuit nonetheless did not "think a justification charge would have affected the outcome if a jury found that the prosecution proved all the elements of second degree murder and a jury proceeded to a self-defense claim." 900 F.2d at 543. The Second Circuit found it important that, under New York law, before deliberating on a defense of justification, the jury must determine whether the defendant is guilty or innocent of the crime charged; justification does not negate the elements of

a criminal offense but rather makes a criminal act non-criminal. *People v. McManus*, 67 N.Y.2d at 548-49. "Before a jury need consider a defendant's claim of justification, the jury first must find that the prosecution has met its burden with respect to each element of the crime charged." *Blazic*, 900 F.2d at 542 & n.4 (noting that if the trial court had "given the standard justification charge, it would have been introduced as follows: This completes my charge with respect to the crime of murder in the second degree. . . . If the People have failed to establish all the essential elements of the crime of murder in the second degree . . . as I have just instructed you, you must then find the defendant not guilty. If that is your verdict then you *need not*, of course, consider defendant's further defense of [justification]. However, if you have determined that the People have established all of the elements of the crime of murder in the second degree . . you must then turn to consider his defense known in law as 'justification'. . . .") (quoting 1 Criminal Jury Instructions, New York 867 (1983) (emphasis, ellipses, and alteration in *Blazic*)).

In *Blazic*, as here, the crime charged (murder in the second degree) required the prosecutor to prove beyond a reasonable doubt that petitioner had the "intent to cause the death of another person." N.Y. PENAL LAW § 125.25. The Second Circuit reasoned that "[f]or a jury to find that the prosecution met its burden" of proof that Blazic intended to cause Oliveras' death, "a jury would have had to reject significant aspects of Blazic's account" of the incident. *Blazic*, 900 F.2d at 543. If the jury had found Blazic guilty of murder, that meant the jury "[c]ertainly" "rejected the majority of Blazic's testimony," in which case "a justification charge would not have affected the jury's verdict since his testimony was the only evidence supporting a justification claim." *Id.* The Second Circuit additionally found that even if the jury "accepted portions of Blazic's account," there was "no reasonable view of the evidence derived by parsing

his testimony that supported a finding of justification." *Id.*

In Gibbs' case, as in *Blazic*, before the jury reached the issue of self-defense, the jury first was required to conclude that petitioner shared the requisite criminal intent. While in *Blazic*, the petitioner was the principal and here, the petitioner was alleged accessory, the issue of intent was the threshold determination for the jury to make. As the Court has recounted above, the evidence of Gibbs' intent, was wholly circumstantial. And, as trial counsel pointed out and the prosecution conceded, proof of motive was lacking. Trial counsel cogently argued that petitioner's testimony, taken at face value, offered a version of events that squared with the facts and allowed the jury to find that he did not share a "community of purpose" with co-defendant Nicholas. In this Court's opinion, from a legal-insufficiency standpoint, and leaving aside the credibility of the witnesses, this was an extremely close case. This Court does not believe that a different verdict on liability would have been unreasonable. However, here the jury convicted Gibbs of intentional murder under an accomplice theory. That meant it weighed the various witnesses' credibility and rejected Gibbs' version of events; as discussed above, even if the jury were to assume the truth of his trial testimony, and discount the fact that he lied and fled the scene, there were a number of inconsistencies that could not be adequately explained, and there also was the issue of his broken watch being found next to the victim's body. But, even if the jury, having found criminal liability, had proceeded to consider the defense of justification, I do not believe there was substantial probability that the verdict would have been different.[14]

---

[14] In its later decision, *Jackson v. Edwards*, the Second Circuit explained its finding of harmlessness in *Blazic* based in part on the fact that the jury convicted Blazic of second degree murder, "necessarily suggesting that Blazic intended to commit murder." 404 F.3d at 626. The jury in *Jackson*, by contrast, "acquitted [petitioner] of second degree murder while convicting him of the lesser offense of second degree manslaughter, which only required a showing that Jackson 'recklessly' caused [the victim's] death." *Id.* (quoting N.Y. PENAL LAW § 125.15). The Second Circuit found a "sharp" distinction between *Blazic* and *Jackson*, holding that the "probabilities [we]re

As was the case in *Blazic*, the only evidence supporting the defense of justification came from petitioner himself, whose testimony the jury necessarily had discredited. More important, there was no evidence from petitioner with regard to the critical time period after co-defendant and the decedent were thrown from the car, just before the shooting. This is because petitioner testified that he remained inside the car and did not see what transpired between his two companions. All petitioner could say was that he heard the men yelling and then heard a "pop." The only other available evidence relevant to the issue of how the shooting occurred were these findings–that the decedent was shot at close range, and the gunshot wound to his hand could have been a defensive wound. The jury had nothing more than this from which to assess whether co-defendant Nicholas had an objectively reasonable belief that he needed to use deadly force in order to avoid being killed, much less whether he could, in safety, retreat. I note that the medical examiner's inference about Rowe's hand would being defensive in nature tends to support the conclusion that co-defendant had obtained control of the gun at the time of the shooting. Thus, even assuming co-defendant had at one point had a reasonable fear, he did not act justifiably at the time of the shooting.

Because I conclude that the situations in *Davis* and *Jackson* are distinguishable, as discussed above, I cannot find that the trial court's refusal to instruct Gibbs' jury on self-defense the effect of depriving petitioner "entirely of his defense–on which he had a significant possibility of prevailing–and to insure his conviction." *Jackson*, 270 F.3d at 132. Accordingly, under the Second Circuit's cases on this issue interpreting clearly established Supreme Court precedent, I do not believe Gibbs has not demonstrated that the denial of the justification charge

---

substantial that, if given a justification charge, Jackson's jury might well have acquitted." *Id.*

amounted to an error of constitutional magnitude sufficient to render his trial "fundamentally unfair," *Cupp v. Naughten*, 414 U.S. at 147. Therefore, I recommend denying habeas relief on this claim.

For a certificate of appealability to issue, the petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A substantial showing "does not require a petitioner to demonstrate that he would prevail on the merits, but merely that 'reasonable jurists could debate whether . . .' the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Rhagi v. Artuz*, 309 F.3d 103, 106 (2d Cir.2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)). Given the relative weakness of the state's case against Gibbs, the Court believes that "reasonable jurists" could differ in their conclusions as to the issue of whether the trial court's denial of a jury instruction on justification (self-defense) was an error of New York state law that amounted, under the circumstances of this case, to an error of Federal constitutional magnitude. Therefore, the Court does recommend granting a Certificate of Appealability on this issue.

## IV.    Conclusion

For the foregoing reasons, I recommend dismissing petitioner Dominic Gibbs' petition for a writ of habeas corpus. However, as discussed above, I believe that Gibbs has fulfilled the standard for obtaining a certificate of appealability issue with respect to his claim that the trial court's denial of a jury instruction on justification (self-defense) was an error of New York state law that amounted, under the circumstances of this case, to an error of Federal constitutional magnitude. *See* 28 U.S.C. § 2253(c)(2). Accordingly, I recommend granting a certificate of

appealability with regard to that issue only. Should the District Judge agree that habeas relief is

not warranted but that a Certificate of Appealability is appropriate, the Court would also

recommend appointment of counsel to represent Gibbs on his appeal.


/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: September 30, 2009
      Buffalo, New York

**ORDER**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, FED. R. CIV. P. 72(b) and Local Rule for the Western District of New York 72.3(a)(3). The District Court ordinarily will refuse to consider on de novo review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir.1988). Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir.1988); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**                    /s/ Victor E. Bianchini

_____
                    VICTOR E. BIANCHINI
                    United States Magistrate Judge

Dated: September 30, 2009
        Buffalo, New York